1

2

3

4

5

6

7

8                          **IN THE UNITED STATES DISTRICT COURT**

9                        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    LARRY SCHWARZ,                           No. CIV S-08-2907-CMK

12               Plaintiff,

13        vs.                                  <u>MEMORANDUM OPINION AND ORDER</u>

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
               Defendant.
16
      _____/
17

18               Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20    Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21    judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22    before the court are plaintiff's motion for summary judgment (Doc. 16) and defendant's cross-

23    motion for summary judgment (Doc. 19).

24    / / /

25    / / /

26    / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on July 11, 2005.  In the application, plaintiff claims that disability began on March 8, 2005.  In his motion for summary judgment, plaintiff claims that disability is caused by a combination of: (1) stress; (2) swollen left foot; (3) anxiety, depression, and anger management issues; (4) bilateral carpal tunnel syndrome; (5) hypertension; (6) diabetes mellitus; (7) heart problems; (8) obesity; (9) chest pain; and (10) back, neck, and leg pain.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on April 23, 2007, before Administrative Law Judge ("ALJ") Plauche F. Villere, Jr.   In a August 16, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1.     The claimant has the following severe impairments: stress, hypertension, diabetes mellitus, heart problems, pain in chest, pain in back, neck, and legs, and swollen left foot;

2.     The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3.     The claimant has the residual functional capacity to perform the full range of sedentary work; and

4.     The claimant is capable of performing his past relevant work as an insurance clerk.

After the Appeals Council declined review on October 16, 2008, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## II.  SUMMARY OF THE EVIDENCE

2      The certified administrative record ("CAR") contains the following evidence,

3 summarized chronologically below:

4      April 25, 1984 – Records from U.C. Davis Medical Center indicate that plaintiff

5 was hospitalized following a high-speed vehicle accident.  Plaintiff sustained rib fractures,

6 concussion, renal contusion, left ulnar fracture, right shoulder dislocation, and burns over 25% of

7 his body.

8      February 28, 2005 – X-rays of plaintiff's chest revealed mild cardiomegaly,

9 chronic left upper rib deformity, and minor left lower lobe scarring.

10      March 2, 2005 – Initial assessment notes prepared by physician's assistant Ann

11 Winship reflect that plaintiff was being treated for chest pain.  On physical examination, Ms.

12 Winship offered the following assessment: (1) history of recent chest pain; (2) probable past

13 myocardial infarction; (3) family history of alcoholism; (4) obesity; (5) status post cervical

14 fusion; and (6) status post severe burns to the chest.  Plaintiff's weight at the time was 220

15 pounds.

16      March 23, 2005 – Follow-up notes by Dr. Factor indicate that, upon examination,

17 plaintiff was a "[h]ealthy-looking, though overweight gentleman in no acute distress."  Plaintiff's

18 weight at the time was 224 pounds.

19      August 13, 2005 – Plaintiff's friend, Maureen Clark, submitted a "Function

20 Report – Adult – Third Party."  When asked to describe plaintiff's daily activities, Ms. Clark

21 responded: "He has been trying to do less strenous [sic] things to keep his stress level down he

22 takes short walks."  She also reported that plaintiff breathes in a "strange way" as if he is

23 catching his breath.  Ms. Clark stated that plaintiff has no problems with personal care tasks.  She

24 stated that he does minimal cooking, vacuums sometimes, and makes his bed, but not every day

25 because he requires assistance.  Ms. Clark reported that plaintiff "gets really tired a lot faster

26 lately."  She also stated that plaintiff has "fatigue, sweating, and shortness of breath. . . ."  Ms.

3

1  Clark stated that plaintiff was "moody – agitated over things more lately."  She offered the

2  following remarks:

3             When I first noticed his getting agitated or upset is when he can't
             do the things he use to do like chores, shopping, etc.  Now he is sometimes
4            tired less energetic and has a harder time and it takes longer to do.  It upset
             him that he can[not] play sports with son or do some of things he would
5            like to do because of his ability now and its stress on him now.

6             September 20, 2005 – Agency examining doctor Timothy Canty, M.D., reported

7  on a comprehensive psychiatric evaluation.  There were no psychiatric records available for the

8  doctor to review.  At the time of the evaluation, plaintiff's chief complaint was "A lot about

9  stress."  Dr. Canty outlined the following history as reported by plaintiff:

10            His wife died suddenly of cardiac problems in August of 2002.  He
             says he has been under a lot of stress since then and was involved in a
11           malpractice case against the hospital.  At one point he developed chest
             pain, shortness of breath, and was diagnosed with high blood pressure.  He
12           describes situational anxiety related to stress and has tried to cut back.  He
             does not have mental health treatment and has never been psychiatrically
13           hospitalized.

14  Plaintiff was not currently taking any psychiatric medications.  Plaintiff reported the following

15  family, social, and employment history:

16            He lives in a house with his two children ages 20 and 18.  He
             graduated from high school and has never been arrested.  His last job was
17           working for an insurance company.  He did data entry and filing.  He
             worked for four years and quit on  March 11, 2005.  He said he found the
18           job too stressful.  He was awarded a settlement in April or May of 2005
             from his malpractice suit.
19

20  Plaintiff reported that he does his own chores and handles his own finances.  He said he

21  socializes well with his girlfriend.  He also told the doctor that he likes to go for walks, watch

22  television, and "go on the computer."  Plaintiff admitted to smoking marijuana and said that the

23  last time he had done so was two months prior.  Following mental status evaluation, Dr. Canty

24  was unable to diagnose any psychological problem and assigned a GAF score of 80.  Dr. Canty

25  concluded that plaintiff is "fully functional from a psychiatric standpoint and can manage money.

26  / / /

1          September 28, 2005 – An agency consultative doctor submitted a psychiatric

2    review technique form.  The doctor concluded that plaintiff had no medically determinable

3    psychological impairment.

4          September 30, 2005 – Plaintiff's treating cardiologist Dennis R. Breen, M.D.,

5    reported on a cardiologic consultation.  Plaintiff reported the following history to the doctor:

6          Mr. Schwarz is a 44-year-old, white male who has a history of chest
           discomfort occurring in the context of high blood pressure and diabetes, as
7          well as hyperlipidemia.  He has chest discomfort with features of angina
           pectoris in that it is retrosternal, exertional in nature with no radiation to
8          the neck, shoulders, or arms.  He is fairly vague in describing the
           frequency with which he gets this.  He has nitroglycerine in his possession,
9          but has not used it.  He denies associated diaphoresis, but does have
           occasional shortness of breath.

10

11   For social history, plaintiff reported that he lives with his two children ages 15 and 17.[1]

12   Following his examination, the doctor listed the following impressions: (1) chest pain with

13   features suggestive of angina pectoris; (2) electrocardiographic abnormalities suggestive

14   of coronary artery disease; (3) diabetes mellitus type 2; (4) hypertension by history;

15   (5) hyperlipidemia by history; (6) obesity; and (7) positive family history of premature heart

16   disease.  Dr. Breen offered the following recommendation:

17         Mr. Schwarz had a cardiac evaluation in March of 2005.  Part of that
           evaluation consisted of a myocardial perfusion imaging study on March
18         18th.  The results of that are reported only in part.  The key piece, which
           was the interpretation of the imaging portion of the study, was not reported
19         for me to review.  Obtaining that would be worthwhile.  Otherwise, I am
           forced to speculate that he probably does have underlying ischemic heart
20         disease.  In fact, I would say there is a high probability he has a significant
           degree of cardiac ischemia.

21
22         He will require life-long medical supervision and appears to be limited in
           his exercise capacity, although precise quantization of that is difficult.  He
23         states that he can walk for between one-quarter and one-half miles on level
           ground before he must stop to rest.

24   / / /

25   _____

26         [1]     It is unclear why, just 10 days earlier, he reported to Dr. Canty that his children
     were ages 18 and 20.

1        October 26, 2005 – An agency consultative doctor submitted a physical residual

2    functional capacity assessment.  The doctor concluded that plaintiff could lift 20 pounds

3    occasionally and 10 pounds frequently.  He also concluded that plaintiff could stand/walk for at

4    least two hours in an eight-hour workday, and that plaintiff could sit for six hours in an eight-

5    hour workday.  The doctor concluded that plaintiff's ability to push/pull was unlimited.  Plaintiff

6    could perform postural activities, such as balancing and stooping, occasionally.  No visual,

7    manipulative, communicative, or environmental limitations were noted.

8        July 5, 2006 – Dr. Breen reported following a physical examination of plaintiff.

9    The doctor noted:

10       . . . He has had some problems obtaining some of his medications for
         reasons that are not quite clear to me.  He seems to be without his diabetes

11       meds currently.  He refuses to use nitroglycerin for his continuing episodes
         of chest discomfort for reasons also that are unclear.

12

13   At the time of this examination plaintiff's weight was 223 pounds.

14       March 29, 2007 – Dr. Breen reported following a physical examination of

15   plaintiff.  The doctor provided the following background:

16       Larry Schwarz, the 45 year old white male with a history of high blood
         pressure, type 2 diabetes, hyperlipidemia, and chest discomfort suggestive

17       of angina pectoris, returned to my office today after a lengthy absence.  He
         was last seen in July of 2006 at which time he apparently lost his insurance

18       coverage.  He informs me that he is taking Fluozetine, 40 mg daily along
         with his other medications.  He was hospitalized about a month ago with

19       chest pain.  He is quite vague about how frequently he experiences chest
         pain and it does not seem to correlate necessarily with physical activity or

20       the classic stimuli for angina.  When asked how far he can walk without
         having to stop, he answers two blocks.  When asked why he must stop

21       after walking two blocks, he refers to pain in his feet and legs and then to
         pain in his lower back.  He does not volunteer that it is shortness of breath

22       or chest pain that causes him to stop.  All of this is very confusing,
         especially in view of his multiple risk factors for coronary artery disease

23       and the acknowledged concern about ischemic heart disease based on his
         prior myocardial perfusion scan that was equivocal at best and certainly

24       not strongly positive.

25   / / /

26   / / /

The doctor listed the following as "current problems": (1) obesity; (2) hyperlipidemia; (3) diabetes mellitus, type 2; and (4) left testicular swelling.  Plaintiff's weight at the time was 229 pounds.  The doctor noted that plaintiff's weight was up six pounds since July 2006.

May 3, 2007 – Robert Franklin, M.D., of Sacramento County Mental Health reported following a mental status examination of plaintiff.  The doctor stated:

> The patient was on time for his interview.  He was moody during the interview; first angry, loud, and with pressured speech, and then sad, tearful, and depressed especially when relating his circumstances of his wife's death and his continued grieving over her passing.  He reported that he wakes up in the night every two hours and has negative thinking continuously.  He also has anxiety and agitation when he awakens and starts thinking.  He has no overt hallucinations, delusions, or ideas of reference.  He complains of ongoing severe depressions with occasional suicidal ideas, but reports that he would never hurt himself because of his children.  He still feels angry and hurtful towards the doctors who misdiagnosed his wife and the lawyer who has not helped him regarding the negligence of the doctors.  His insight and judgment seems fair. Memory, recent and remote, appears intact.

Plaintiff's weight at the time was 230 pounds.  Plaintiff was diagnosed with bipolar disorder, mixed, without psychotic features.

March 5, 2008 – On follow-up with Sacramento County Mental Health, plaintiff reported no hallucinations or ideations.  He said that he still cannot "come to terms with the idea that [his wife] is [dead]."  The chart notes reveal: "Client also admits to use of alcohol and marijuana in conjunction with his medications."

June 22, 2008 – Plaintiff reported on follow-up with Sacramento County Mental Health that he was experiencing mood swings and was "very angry about not being able to get SSI, disability, or Medi-Cal."

August 4, 2008 – Chart notes from Sacramento County Mental Health state:

> Client comes in for a refill of his medications.  He did admit that he was confused about how many Depakote he was supposed to take, so he had been taking three at night instead of two tablets two times a day as he was advised last visit.  He reports that he has been tired, taking Seroquel 25 mg three times a day.  He sleeps a lot sometimes during the day as well.  Other than that, he thinks his mood swings have improved.  He still has some depression.  He has a fair amount of energy and motivation. . . .

7

September 23, 2008 – Follow-up chart notes from Sacramento County Mental Health reflect as follows:

> . . .Client is on time and in good spirits.  He denies any hallucinations or ideations today.  Client states that his mood swings and depression have become manageable and that he is currently without issues at this point with the exception of housing.  Client states that there is a time limit on his housing and that he would need assistance in locating new dwellings for his family.  Client reports of getting adequate amounts of sleep at night and that his appetite is good.

The notes indicate that plaintiff's speech was clear and coherent and that he did not appear pressured or manic.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

# IV.  DISCUSSION

Plaintiff argues: (1) the ALJ erred in determining that plaintiff's testimony was not credible; (2) the ALJ failed to consider medical evidence submitted after the hearing in determining plaintiff's residual functional capacity; (3) the ALJ ignored a third-party statement from plaintiff's friend; and (4) the ALJ failed to consider plaintiff's obesity.

## A.    **Plaintiff's Credibility**

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof.  Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom.  By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

///

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged,
including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,
947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the
claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent
testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a
prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and
(5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See
Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the
claimant cooperated during physical examinations or provided conflicting statements concerning
drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the
claimant testifies as to symptoms greater than would normally be produced by a given
impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See
Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

As to plaintiff's credibility, the ALJ stated:

After considering the evidence of record, the undersigned finds that the
claimant's medically determinable impairments could reasonably be
expected to produce the alleged symptoms, but that the claimant's
statements concerning the intensity, persistence, and limiting effects of
these symptoms are not entirely credible.

The claimant alleges significant limitations, and he contends that he
cannot work.  While the claimant has had numerous physical complaints
and sees his physician on a regular basis, the minimal clinical findings do
not justify the claimant's contention that they keep him from working.
While he has received treatment for his chest pain, the allegedly disabling
impairment, the treatments have been essentially routine and conservative
in nature.

The claimant complained of chronic fatigue, some blurring and double
vision, shortness of breath, and chronic joint and back pain.  Physical
exam showed the claimant's blood pressure was 130/82 and by April 2006
his blood pressure was 110/70.  The claimant's heart tones were normal
without S3 gallops or murmurs.  His lungs were clear to auscultation and

percussion.  He had a regular rhythm heart rate.  Extremities showed no edema.  Neuro exam was intact.  A chest x-ray showed no active disease of the chest, a myocardial perfusion imaging report was negative, and an echocardiogram showed normal wall motion in all segments with ejection fraction of 65%, normal LV function, normal valvular structures, and normal Doppler examination.  No paracardial effusion was seen.  An EKG showed left axis deviations, QS waves in anterior wall with prior inferior wall infarction and anterolateral wall ST & T changes.  All of this suggestive of underlying heart disease.  An echocardiogram showed near normal wall motion and essentially normal valvular structures.  The physician stated that despite the absence of reversible ischemia on his myocardial perfusion scan, an outpatient heart catheterization is called for outpatient.

Furthermore, the claimant presented to the emergency room on chest tightness in December 2005; and epigastric pain in January 2006.  On both occasions the claimant was treated with medications (Exhibit 12F).  The claimant refuses to use Nitroglycerine for his continuing episodes of chest discomfort for reasons that are unclear.

He continues to monitor his blood sugars which are averaging about 115-120.  The physician stated that the claimant's diabetes millitus was well under control.  The claimant looked comfortable and in no distress.  The claimant is also treated for hypertension, but it does not rise to the level of a severe impairment and is under fair control with medications based on the medical records.  The claimant's blood pressure was 110/70.

The claimant had also complained of a lot of stress at a psychiatric exam in September 2005.  He stated that his wife died suddenly of cardiac problems in August 2002.  He described situational anxiety related to stress and has tried to cut back.  The claimant states he does not have mental health treatment and has never been psychiatrically hospitalized.  He is not on any psychiatric medications.  The psychologist noted that the claimant appeared to be happy on examination with a full affect.  The physician reported that the claimant described situational changes in his emotional state related to the stress he has encountered over the last several years.  The physician diagnosis Axis I: None; Axis II: None; and Axis V: assessed with a GAF of 80.  The physician stated that the claimant is fully functional from a psychiatric standpoint and he can manage money.

Furthermore, in a psychiatric review technique form the state agency physician determined that the claimant had no medically determinable impairment (Exhibit 5F).

Although the claimant complained of back, neck and left leg discomfort, the claimant is able to bend, reach, move about, and use his arms and legs in a satisfactory manner.  The objective findings do not demonstrate persistent abnormalities in motor functioning, or bony destruction or similar abnormalities that would meet or equal any of the pertinent musculoskeletal or neurological disorders set forth in the listing.  The

1

undersigned notes that the claimant's physician has not defined any
exertional or other physical limitations resulting from these disorders.

2

Furthermore, the medical evidence failed to support the intensity of the
claimant's symptoms, and aggravating factors.  The evidence consistently
shows that the claimant's subjective complaints are much worse than the
objective findings as evidenced by the record.

3

4

5

The record contains a residual functional capacity assessment(s)
completed by a physician employed by the State Disability Determination
Service (DDS).  The state agency doctors opined that the claimant could
perform sedentary work (Exhibit 7F).  The undersigned concurs.

6

7

8   As discussed above, the ALJ may consider the nature of the symptoms alleged, medication taken,

9   course of treatment, and functional limitations in assessing credibility.  See Bunnell, 947 F.2d at

10  345-47.  Here, the ALJ noted plaintiff's conservative course of treatment for his impairments,

11  plaintiff's unexplained failure to take medication, and the functional limitations imposed by

12  plaintiff's impairments.  The court finds that these are specific and cogent reasons for

13  discounting plaintiff's credibility.

14          Because there is no affirmative evidence of malingering, the question is whether

15  these reasons are sufficiently supported by the record so as to be clear and convincing.  The court

16  finds that the ALJ's reasons meet this test.  First, the evidence reflects that plaintiff refused to

17  take nitroglycerin for his chest pain, and his refusal to do so was never adequately explained to

18  his doctors.  Second, the evidence shows that, despite plaintiff's testimony of disabling

19  symptoms caused by his impairments, plaintiff's course of treatment has generally been quite

20  conservative, consisting of out-patient procedures and medication.  Third, as the ALJ noted, the

21  various doctors opined that plaintiff's impairments allow him to perform at least sedentary work

22  and are not totally disabling as plaintiff states.

23          The court rejects plaintiff's argument that the ALJ erred by not taking into

24  account a statement by Dr. Breen that plaintiff "would need lifelong medical supervision. . . ."

25  The question is not whether plaintiff has a severe impairment.  In fact, the ALJ found that

26  plaintiff's  stress, hypertension, diabetes mellitus, heart problems, pain in chest, pain in back,

1   neck, and legs, and swollen left foot all constitute severe impairments.  The question is also not

2   whether plaintiff would require lifelong treatment for these impairments.  The question is

3   whether, despite having an impairment that requires lifelong care, such impairments produce

4   disabling symptoms.  As the ALJ properly concluded, plaintiff's subjective statements that they

5   do are not credible.

6           Similarly, Dr. Breen's conclusion that plaintiff "probably does have ischemic

7   heart disease and that his exercise capacity is limited" does not undermine the ALJ's analysis.

8   First, Dr. Breen's conclusion is certainly less than certain.  And, even if it was, the question is not

9   whether plaintiff has ischemic heart disease.  The question is whether such condition limits

10  plaintiff in the way he states it does.  As to plaintiff's ability to exercise, a limited capacity for

11  exercise is certainly consistent with the agency doctors' conclusion that plaintiff is capable of at

12  least sedentary work.  Thus, Dr. Breen's finding that plaintiff's ability to exercise is limited does

13  not undermine the ALJ's credibility analysis.

14          Finally, the court agrees with the ALJ that plaintiff's statements concerning

15  limitations imposed by mental impairments are not consistent with plaintiff's activities or the

16  medical evidence.  Plaintiff states that his depression and anxiety stem from his wife's death in

17  2002.  However, plaintiff states that he was not disabled until 2005.  Plaintiff's ability to work

18  immediately after his wife's death in 2002 through 2005 is not consistent with plaintiff's

19  statement that his allegedly disabling mental impairment was the result of his wife's death.

20  Further, Dr. Canty opined in September 2005 that plaintiff was not disabled from a psychological

21  point of view and assigned a GAF score of 80.  Subsequent records from Sacramento County

22  Mental Health reveal that, with proper medication, symptoms associated with plaintiff's mental

23  impairments were substantially reduced.

24  / / /

25  / / /

26  / / /

13

1  **B.**   **Residual Functional Capacity Finding**

2      Plaintiff states that an assessment of residual functional capacity requires that all

3  relevant medical evidence of record be considered and argues:

4          Here, Plaintiff's representative submitted strongly favorable
       evidence on June 26, 2007.  CT 428.  These medical records included a
5       psychiatric assessment diagnosing Plaintiff with Bipolar I and finding a
       GAF of 46.  CT 443.  However, even though the ALJ's decision was
6       issued on August 16, 2007, the ALJ makes no mention of these records,
       and these records are not included in the exhibit list for the hearing.  CT 1-
7       3, 33.  It appears, therefore, that the hearing office simply lost these
       records.

8                               * * *

9          The ALJ's failure to consider these records is material since these
10      records could have convinced the ALJ that Plaintiff neither had the ability
       to concentrate, even on simple repetitive tasks, nor that Plaintiff's temper
11      would permit him to be employed.  Moreover, the combination of
       Plaintiff's Bipolar I, heart condition, and obesity appears to equal a
12      Listing.
           Thus the ALJ erred by not considering these newer records and
13      Plaintiff is entitled to a remand.

14  Plaintiff also contends that, should the court determine that the records were never submitted to

15  the ALJ – either before or after the hearing – they can nonetheless be considered now.

16      The court rejects plaintiff's argument that the ALJ erred by not considering

17  evidence submitted post-hearing.  This court may consider evidence submitted to the Appeals

18  Council after the administrative hearing.  See Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir.

19  1993).  The question is whether the ALJ's decision is supported by evidence in the record,

20  including evidence submitted after the hearing.  See Weetman v. Sullivan, 877 F.2d 20, 21-23

21  (9th Cir. 1989).

22      The court also disagrees with plaintiff's argument that, had the ALJ considered

23  and discussed post-hearing evidence, the result would have been different.  The record reflects

24  that plaintiff submitted the following medical evidence after the hearing: (1) Exhibit AC-4 –

25  operative report dated 8-17-2007 from Sutter General Hospital; and (2) Exhibit AC-5 – medical

26  records from Sacramento County Mental Health covering the period 4-25-2007 through 9-23-

14

2008.  In particular, plaintiff points to Dr. Franklin's May 2007 report.  The court finds nothing in this report which would have changed the result.  The report is largely a summary of plaintiff's various subjective complaints at the time.  On mental status examination, the doctor reported the following objective findings: "His insight and judgment seems fair.  Memory, recent and remote, appears intact."  The court does not agree that this record "could have convinced the ALJ that Plaintiff neither had the ability to concentrate, even on simple repetitive tasks, nor that Plaintiff's temper would permit him to be employed."  Other post-hearing records from Sacramento County Mental Health show that, by 2008, plaintiff's "mood swings and depression have become manageable and that he is currently without issues at this point. . . ."

###    C.    Third-Party Statement

In determining whether a claimant is disabled, an ALJ generally must consider lay witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at 919.

The ALJ, however, need not discuss all evidence presented.  See Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain why "significant probative evidence has been rejected."  Id. (citing Cotter v. Harris, 642 F.2d 700, 706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored evidence which was neither significant nor probative.  See id. at 1395.  As to a letter from a treating psychiatrist, the court reasoned that, because the ALJ must explain why he rejected uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was controverted by other medical evidence considered in the decision.  See id.  As to lay witness

1    testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

2    concluded that the evidence was properly ignored because it "conflicted with the available

3    medical evidence" assessing the plaintiff's mental capacity.  Id.

4            In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent

5    disregard of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay witness

6    had testified about the plaintiff's "inability to deal with the demands of work" due to alleged

7    back pain and mental impairments.  Id.  The witnesses, who were former co-workers testified

8    about the plaintiff's frustration with simple tasks and uncommon need for supervision.  See id.

9    Noting that the lay witness testimony in question was "consistent with medical evidence," the

10   court in Stout concluded that the "ALJ was required to consider and comment upon the

11   uncontradicted lay testimony, as it concerned how Stout's impairments impact his ability to

12   work."  Id. at 1053.  The Commissioner conceded that the ALJ's silent disregard of the lay

13   testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth

14   Circuit rejected the Commissioner's request that the error be disregarded as harmless.  See id. at

15   1054-55.  The court concluded:

16           Because the ALJ failed to provide any reasons for rejecting competent lay
             testimony, and because we conclude that error was not harmless,
17           substantial evidence does not support the Commissioner's decision . . .

18           Id. at 1056-67.

19           From this case law, the court concludes that the rule for lay witness testimony

20   depends on whether the testimony in question is controverted or consistent with the medical

21   evidence.  If it is controverted, then the ALJ does not err by ignoring it.  See Vincent, 739 F.2d at

22   1395.  If lay witness testimony is consistent with the medical evidence, then the ALJ must

23   consider and comment upon it.  See Stout, 454 F.3d at 1053.  However, the Commissioner's

24   regulations require the ALJ consider lay witness testimony in certain types of cases.  See Smolen

25   v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13.  That ruling requires the ALJ to

26   consider third-party lay witness evidence where the plaintiff alleges pain or other symptoms that

1   are not shown by the medical evidence.  See id.  Thus, in cases where the plaintiff alleges

2   impairments, such as chronic fatigue or pain (which by their very nature do not always produce

3   clinical medical evidence), it is impossible for the court to conclude that lay witness evidence

4   concerning the plaintiff's abilities is necessarily controverted such that it may be properly

5   ignored.  Therefore, in these types of cases, the ALJ is required by the regulations and case law to

6   consider lay witness evidence.

7        Plaintiff argues:

8          Here, Plaintiff's friend Maureen Clark completed a form entitled
       "Function Report – Adult – Third Party" on August 13, 2005.  In this
9          report Ms. Clark stated that plaintiff "gets really tired a lot faster lately."
       CT 110.  She said that Plaintiff suffers from fatigue, sweating, and
10         shortness of breath.  CT 112.  Also, she described how Plaintiff gets
       agitated easily.  CT 113.
11         The ALJ makes no mention of this report.  This is plainly error.
       And it is material since Plaintiff's fatigue and violent temper are the
12         primary impairments that Plaintiff is alleging.  For this reason Plaintiff is
       entitled to a remand.

13

14  The court does not agree.  While it appears that the ALJ did not address Ms. Clark's statement in

15  the hearing decision, the ALJ was not required to do so because Ms. Clark's statement is not

16  probative.  Ms. Clark stated that plaintiff was trying to keep his "stress level down," that plaintiff

17  breathed in a "strange way," that plaintiff got tired "a lot faster lately," and that he was "moody –

18  agitated over things more lately."  None of these statements speak to plaintiff's capabilities given

19  that Ms. Clark does not actually say in what way these symptoms limit plaintiff.  In fact, Ms.

20  Clark stated that plaintiff has no problems with personal care tasks and that he does minimal

21  cooking, vacuuming, and some household chores.  To the extent Ms. Clark's statements can be

22  seen as her testimony that plaintiff is disabled, such testimony would be wholly inconsistent with

23  the medical record and, for this reason, would have been properly ignored by the ALJ.

24

25     **D.**   **Plaintiff's Obesity**

26       In 1999, obesity was removed from the Listing of Impairments.  Obesity may still

17

1  enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's

2  musculoskeletal, respiratory, or cardiovascular system." Celaya v. Halter, 332 F.3d 1177, 1181

3  n.1 (9th Cir. 2003).  Thus, as part of his duty to develop the record, the ALJ is required to

4  consider obesity in a multiple impairment analysis, but only where it is "clear from the record

5  that [the plaintiff's] obesity . . . could exacerbate her reported illnesses." Id. at 1182; see also

6  Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya and concluding that

7  a multiple impairment analysis is not required where "the medical record is silent as to whether

8  and how claimant's obesity might have exacerbated her condition" and "the claimant did not

9  present any testimony or other evidence . . . that her obesity impaired her ability to work").

10  Where a multiple impairment analysis is not required, the ALJ properly considers obesity by

11  acknowledging the plaintiff's weight in making determinations throughout the sequential

12  analysis.  See Burch, 400 F.3d at 684.

13          Plaintiff argues:

14                  Even though obesity wasn't fully argued to the ALJ, the ALJ was
        still required to consider it. . . . [¶] The medical record documents that

15      Plaintiff suffers from obesity.  Dr. Breen's cardiology CE report of
        September 30, 2005, notes a weight of 236 pounds and a height of 71

16      inches.  This yields a BMI of 32.9.  (citation omitted).  Plaintiff's weight
        was down to 205 pounds on January 31, 2006, but was back up to 220

17      pounds by April 14, 2006 and up to 230 pounds by August 31, 2006.  CT
        369, 372-373.

18              This is material because Plaintiff suffers from fatigue resulting
        from his heart condition, and obesity can exacerbate such fatigue.  CT 483;

19      SSR 02-1p.  Plaintiff also suffers from psychological conditions which
        might be exacerbated by the effect obesity has on his appearance.

20              Since the ALJ failed to consider Plaintiff's obesity Plaintiff is
        entitled to a remand for a new hearing with instructions to the ALJ to

21      consider Plaintiff's weight problem.

22  Here, plaintiff is correct that the ALJ did not consider obesity as part of a multiple impairment

23  analysis.  The ALJ did, however, acknowledge plaintiff's weight in the hearing decision.

24  Specifically, when discussing Dr. Breen's treatment records, the ALJ noted that plaintiff's weight

25  was 205 pounds in September 2005 and that this was down 31 pounds from plaintiff's prior visit

26  with the doctor.   The ALJ also noted plaintiff's weight of 220 pounds when discussing an April

14, 2006, examination performed by Dr. Factor.

Because the ALJ only made note of plaintiff's weight, the question is whether the ALJ was required to consider obesity in more detail as part of a multiple impairment analysis. As discussed above, he would have been required to do so only if: (1) the medical record suggests that obesity might have exacerbated plaintiff's condition; and (2) the plaintiff presented testimony or other evidence indicating that obesity impairs his ability to work.  Upon review of the entire record, the court can find no instance where any medical doctor suggested that plaintiff's weight contributed to or exacerbated his condition.  While plaintiff states that obesity can exacerbate fatigue associated with his heart condition, no doctor has said this is so in plaintiff's particular case.  And no doctor has opined that plaintiff's obesity exacerbates or contributes to his mental impairment by way of reduced self-image.  Most compelling, plaintiff never argued at the agency level that his weight contributes to his impairments or otherwise represents a disability.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

    1.    Plaintiff's motion for summary judgment (Doc. 16) is denied;

    2.    Defendant's cross-motion for summary judgment (Doc. 19) is granted; and

    3.    The Clerk of the Court is directed to enter judgment and close this file.

DATED:  June 3, 2010

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE